**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **SILVIA BROWN,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | **5:05-CV-472 (WDO)** |
| | : | |
| **PULASKI COUNTY BOARD OF** | : | |
| **EDUCATION, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

Plaintiff Silvia Brown, an African-American former employee of Defendant school district, filed this case claiming discriminatory termination, First Amendment violations and breach of contract. Defendants contend Plaintiff was terminated for insubordination and unprofessionalism and filed a motion for summary judgment requesting that Plaintiff's claims be dismissed.

### *Factual and Procedural Background*[1]

Plaintiff began working for the Pulaski County School District in 1992 as a paraprofessional. Soon after she began working for the school district, Plaintiff applied for the job of resource coordinator of the Pre-K program and began working in this position in January of 1994. Plaintiff was the only parent resource coordinator for the Pre-K program.

---

[1] These are the material facts presented in the record with any dispute by Plaintiff noted and with all facts construed in Plaintiff's favor as the non-movant.

Plaintiff continued working as resource coordinator until she was terminated on October 12, 2004.

Rhonda Black was Plaintiff's immediate supervisor from May of 2003 until Plaintiff's termination. Defendant Dr. Linda Hayden was Superintendent of the school district for approximately a year and a half and was in that position at the time of Plaintiff's termination. Defendant Hayden resigned from her position in 2005 and currently works with the Newton County school district as Associate Superintendent for curriculum, instruction and technology.

On September 23, 2004, Dr. Hayden held a meeting with the Pre-K staff. The purpose of the meeting was to inform the staff about the transfer of one of the Pre-K teachers, Cathy Sue Coody, to the elementary school and to address gossip in the school about the transfer. Ms. Coody had been caught shoplifting at Wal-Mart. Before the meeting, Rhonda Black had mentioned to Dr. Hayden that Plaintiff Brown had informed Ms. Coody there were several teachers at the Pre-K school who stated they were glad Ms. Coody was being transferred. At the meeting with the Pre-K staff, Dr. Hayden informed them that, if anyone in the community asked them any questions about Ms. Coody or her transfer, the staff member needed to direct those people to the Board of Education. Prior to this meeting, several staff members and a custodian had been talking about the matter with Plaintiff Brown although Plaintiff denies "initiating" the conversations. After the September 23, 2004 meeting, Dr. Hayden and Ms. Black met with Plaintiff in Plaintiff's office. Dr. Hayden

wanted to discuss the Ms. Coody issue with Plaintiff and decided during the staff-wide meeting to also discuss what Dr. Hayden determined was unprofessional behavior by Plaintiff during the meeting consisting of Plaintiff rolling her eyes at Dr. Hayden and muttering under her breath.[2]  Plaintiff denies this characterization of her body language during the meeting.  Dr. Hayden testified that she did not approach Plaintiff to "accuse" her of anything, as Plaintiff has alleged, but to discuss the importance of not gossiping about co-workers.  Dr. Hayden believed that Plaintiff was also very unprofessional during the private meeting in that she became very defensive and argumentative and continually interrupted Dr. Hayden rather than listening to what Dr. Hayden was trying to say.  Dr. Hayden testified that Plaintiff told her that Rhonda Black, Plaintiff's supervisor, could not give directives to Plaintiff and that Plaintiff could only receive directives from individuals in charge of the specific program on which Plaintiff was working.[3]  Plaintiff denies this characterization of her statement about following the directives of Ms. Black.  Dr. Hayden testified that Plaintiff also stated she did not have to follow Dr. Hayden's directives, although Plaintiff denies stating that as well.  When Plaintiff stated she felt she could no longer speak to Dr. Hayden without an attorney present, Dr. Hayden ended the meeting.

On October 5, 2004, Ms. Black gave Plaintiff a Professional Development Plan that dealt mostly with Plaintiff's inability to type, or to type efficiently enough to prepare the

---

[2]Hayden Dep. at 42-46.

[3]Id. at 48-52.

3

newsletter that was part of Plaintiff's responsibilities that Plaintiff had passed off to someone else. Plaintiff read the Plan and signed it, although Plaintiff disagreed with the statement that she lacked typing skills. Plaintiff contends the Plan was a discriminatory act against her.

On October 7, 2004, Plaintiff met with Dr. Hayden, Ms. Black and Neal Clark, the Assistant Superintendent, at the Board of Education's office. Dr. Hayden gave Plaintiff a letter of reprimand and asked Plaintiff to read and sign the letter. The letter pertained to several issues including:

- Dr. Hayden's belief that Plaintiff responded unprofessionally during the September 23 meetings;

- that Plaintiff's demeanor, attitude and manner were discourteous, rude, disrespectful and unacceptable;

- that Plaintiff should not have stated she did not have to follow Ms. Black's directives;

- that Plaintiff needed to keep her office door open so that she could be accessible to parents, teachers and Ms. Black;

- that Plaintiff needed to work on her poor attitude and negative behavior and needed to learn to stay focused;

- that Plaintiff needed to learn to listen when her supervisors gave her directions instead of continually interrupting;

- that threatening to bring a lawyer to every meeting is inappropriate and that Plaintiff was free to discuss any issue she pleased with her lawyer when she was not at work;

- that Plaintiff needed to refrain from having conversations with school board members during work hours unless the matter involved issues related to Plaintiff's job (because Plaintiff had been talking to one particular school board member with whom Plaintiff was friends, Gwen Brown, at the school, Dr. Hayden thought they were meeting and chatting excessively and Dr. Hayden was unsure if they were having professional or personal conversations but did tell Plaintiff she had no problem with Plaintiff and Gwen Brown discussing Plaintiff's job responsibilities during school hours);

- that Plaintiff's work hours were from 8:00 a.m. - 4:00 p.m. and she needed to have arrangements made for her daughter so her daughter did not continue to interrupt meetings as she had during the previous meeting; and

- that Plaintiff needed to remember that professionalism was required at all times in her interactions with school personnel and supervisors.[4]

In this letter, Dr. Hayden also informed Plaintiff that disciplinary actions would be recommended for these issues at the next board meeting and that failure to make the requested changes in behavior and attitude would result in a recommendation of termination.

---

[4]Doc. 60, Plf.'s Ex. 5.

Dr. Hayden testified that at the time the letter was written it was her intention to make a recommendation to the Board to transfer Plaintiff to a paraprofessional position, mainly because of her behavior during the September 23 meetings.[5] On October 12, 2004, just prior to the start of the scheduled board meeting, Plaintiff's husband delivered a letter to Dr. Hayden and to the Board, the contents of which were the same, that detailed Plaintiff's responses to Dr. Hayden's previous letter which included:

- that Plaintiff knew Ms. Black was her supervisor and that Plaintiff had done everything she had been instructed to do;

- that other people had gone to Plaintiff to gossip about Ms. Coody but in the future Plaintiff would direct anyone with questions about Ms. Coody to Ms. Coody;

- that parents, teachers and Ms. Black were welcome in Plaintiff's office and Plaintiff did not realize keeping her door closed was a problem;

- that Plaintiff knew being argumentative and defensive was not appropriate and that she had apologized to Dr. Hayden and Ms. Black for their interpretation of her attitude;

- that Plaintiff did not intend the statement about having her lawyer present for future meetings to be a threat, that she would speak with her lawyer on her own time and that she realized her supervisors could meet with subordinates

_____

[5]Hayden Dep. at 65-73.

without the presence of a lawyer;

- that Plaintiff's conversations with Gwen Brown had been about the work Plaintiff was doing at the school;

- Plaintiff apologized for her daughter's interruption of a meeting and stated that if she had known there was going to be a meeting she would have arranged for someone to take care of her child;

- that Plaintiff understood professionalism is required with school personnel; and,

- that Plaintiff looked forward to a "positive and productive" 2004-2005 school year.[6]

Dr. Hayden believed that the tone of Plaintiff's letter showed Plaintiff did not accept Dr. Hayden's and Ms. Black's characterization of her behavior and attitude as unprofessional and that Plaintiff's letter was a continuation of the same type of negative attitude she had shown since the incident on September 23.[7] Dr. Hayden therefore recommended to the Board that Plaintiff be terminated for lack of professionalism, poor attitude, an unwillingness to correct poor behavior and insubordination. Because Plaintiff was a "classified" employee of the school district, she was not entitled to a hearing prior to her termination. Based on Dr. Hayden's recommendation, Board members Ronald Quick,

_____

[6]Doc. 60, Plf.'s Ex. 1.

[7]Hayden Dep. at 78-80; Davis Dep. at 5-6; Dixon Dep. at 9-15.

John Bembry, Jerry Davis, Bonny Dixon and Nancy Young, who constituted a majority, voted in favor of Plaintiff's termination. After the board meeting, Dr. Hayden called Plaintiff and informed her that the Board had voted to terminate her employment and that Dr. Hayden wanted to tell Plaintiff before Plaintiff heard about it from someone else in the community the next day.

Plaintiff thereafter filed a charge of discrimination with the EEOC alleging discriminatory termination. After its investigation, the EEOC issued a determination that it was unable to conclude discrimination occurred and issued a "Notice of Right to Sue." Plaintiff then filed this case alleging she was terminated because of her race; that Dr. Hayden violated her right to freedom of association regarding Dr. Hayden instructing Plaintiff to not discuss non-school matters with Gwen Brown during school hours and instructing Plaintiff that a lawyer was not necessary for school meetings; and, that Plaintiff's termination was a breach of contract. Plaintiff named as defendants the Pulaski County Board of Education,[8] the Pulaski County School District, the Board of Education members who voted in favor of her termination and Dr. Linda Hayden. This matter is now before the Court on a motion to strike filed by the Plaintiff and Defendants' motion for summary judgment.

### Motion to Strike

Plaintiff moved to strike portions of the affidavits of Defendants Ronald Quick, John Bembry, Jerry Davis, Bonny Dixon, Nancy Young, Dr. Linda Hayden and Rhonda Black.

---

[8]Defendants moved for the dismissal of this party as an entity not subject to suit and Plaintiff consented to the dismissal. The Pulaski County Board of Education is therefore dismissed by stipulation.

Plaintiff contends the affidavits contain information that is not based on personal knowledge and therefore hearsay. The following specific language to which Plaintiff objects involves the Board Members' opinions on why Dr. Hayden recommended Plaintiff's termination:

(a) it is my understanding that Dr. Hayden had asked Plaintiff to correct certain behavior and improve her attitude, and in response Plaintiff seemed unwilling to comply with Dr. Hayden's expectations; and

(b) The change in recommendation was based on Plaintiff's behavior in the conference with Dr. Hayden.

These statements from the affidavits are not hearsay because they are not being offered to prove Dr. Hayden said those things but are being offered as explanations for why Dr. Hayden and the Board believed Plaintiff should be terminated.

Plaintiff also contends Dr. Hayden's affidavit contains allegations that were not disclosed during her deposition, specifically: the portion of paragraph 4 in which Dr. Hayden alleged Plaintiff said she kept her door closed so she could work; the portion of paragraph 4 in which Dr. Hayden accused Plaintiff of saying "her lawyer would sit in on any further discussions;" the portion of paragraph 4 in which Dr. Hayden stated "Plaintiff also told me that she would meet with Gwen Brown to discuss personal issues;" and, Plaintiff objects to the portion of Rhonda Black's affidavit which alleged "Plaintiff looked at me and stated "What are you looking at anyway?," "Plaintiff raised her voice during the conversation," and "Plaintiff Brown was discourteous, rude, and disrespectful." These statements that Plaintiff

claims were not disclosed during the depositions were actually discussed at length in the depositions. Finally, there is nothing contradictory between Black's deposition and her affidavit. Accordingly, Plaintiff's Motion to Strike is denied.

### *Summary Judgment Standard*

Summary Judgment is appropriate when the pleadings, depositions and affidavits submitted by the parties show no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The Supreme Court has explained that the moving party's burden may be discharged "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In Celotex, the Court held that summary judgment is appropriate against

> A party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Id. at 322-23. "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact." Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). "Summary judgment . . . is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal

Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" <u>Celotex</u>, 477 U.S. at 327 (citing Fed. R. Civ. P. 1; <u>Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact</u>, 99 F.R.D. 465, 467 (1984)).

### *Title VII Claims*

Plaintiff Brown failed to present direct evidence of discrimination such as specific statements or conduct by employment decision-makers that reflected a bias or discriminatory animus toward a particular protected class. Therefore, Plaintiff's claims are based on circumstantial evidence and subject to the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Koch v. Rugg</u>, 221 F.3d 1283, 1291 n.31 (11th Cir. 2000). Plaintiff must present evidence that (1) she is a member of a protected class; (2) she was qualified for the job in question; (3) she was terminated; and (4) an individual who was not a member of her protected class replaced her. <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1183 (11th Cir. 2001).

Plaintiff established a prima facie case because she is African-American, she was objectively qualified for the job in question, she was terminated and she was replaced by a Caucasian individual. Defendants are therefore required to articulate some legitimate, non-discriminatory reason for Plaintiff's termination. If Defendants make this showing, Plaintiff has an opportunity to show that Defendant's stated reasons for her termination are actually pretext for a discriminatory motive. Plaintiff may succeed in this "by persuading

the court that a discriminatory reason more likely motivated the employer" or by showing that the employer's proffered explanation is not worthy of belief. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (citation omitted). Plaintiff may also establish discrimination if she produces evidence that she was treated *less* favorably than similarly situated employees of a different race *because of* Plaintiff's race. To show that comparator employees are similarly situated, Plaintiff Brown must show that the employees are similarly situated in all relevant respects. "If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown." Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1317 n.5 (11th Cir. 2003) (citations omitted). In making these determinations, the Court must be careful to not allow Plaintiff to simply litigate whether she was a good employee. Cain v. Walton County School Dist., 2006 WL 581195, *7 (Mar. 8, 2006 M.D. Ga.) (citing Rojas v. Fla., 285 F.3d 1339, 1342 (11th Cir.2002)).

Plaintiff Brown contends she did not violate any particular policies or procedures and that she performed her job in the manner she thought was appropriate and, therefore, she should not have been terminated. However, even if Brown did not display the unprofessional conduct as Dr. Hayden believed she had, Dr. Hayden's interpretation of Brown's conduct can be considered if Dr. Hayden (the decision-maker) honestly believed Brown was unprofessional. Knight, 330 F.3d at 1318 n.6 (citing Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir.1989) ("The law is clear that, even if a Title VII claimant did not

in fact commit the violation, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.")).  The Court need not determine that Dr. Hayden was correct in her assessment of Brown's performance; it need only determine that Dr. Hayden in good faith believed Brown's performance to be unsatisfactory and that the asserted reason for the discharge is not pretext for discrimination.  Moore v. Sears, Roebuck & Co., 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (citations omitted).  An employer has a right to interpret its rules as it chooses, "and to make determinations as it sees fit under those rules.  [The anti-discrimination statutes only prohibit] discrimination."  Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) (citation omitted).  Often mistaken for more than what it is, most plaintiffs fail to comprehend that "Title VII is not a federal 'civility code.'"  Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).  While an employee who receives criticism or negative evaluations in the workplace may suffer in some way, the protections of Title VII simply do not extend to every action that makes an employee unhappy.  Davis v. Town of Lake Park, 245 F.3d 1232, 1242 (11th Cir. 2001).  The federal courts do not "sit as a super-personnel department that reexamines an entity's business decisions," nor do they "sit to second-guess the business judgment of employers."  Id. at 1244 (citations omitted).  An employer may "fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  Nix, 738 F.2d at 1187.  Courts "are not in the business of

adjudging whether employment decisions are prudent or fair. Instead, [their] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir.1999).

Plaintiff provided a great deal of speculation and assumptions as to why she was allegedly treated differently from her Caucasian colleagues. However, her belief or feeling that some action by Dr. Hayden, or any defendant, was discriminatory does not show that discrimination actually occurred. The individuals Plaintiff Brown identified as comparators, those who allegedly committed more serious infractions yet were not terminated, were not actually similarly situated to her because they were in a different classification of employment, "certified" while Plaintiff was "classified." "Under Georgia law, a school board may terminate an employee under an employment contract only for certain enumerated reasons." Cain, 2006 WL 581195, n.5 (finding plaintiff could not use tenured, contract school district employees as comparators because plaintiff was an "at-will" employee) (citing O.C.G.A. § 20-2-940(a)). "Further, if a school board does choose to terminate an employee, the board must follow certain procedures, including giving written notice, perfecting service of the notice, holding a hearing, and issuing a decision." Id. (citing O.C.G.A. § 20-2-940(b)-(f)). "These protections also apply when a school board decides to demote, or not to renew an employment contract of, certain 'tenured' employees." Id. (citing O.C.G.A. § 20- 2-942). In the case at bar, the comparator employees were entitled to progressive disciplinary procedures and other protections before they could be terminated.

Accordingly, "Defendants' failure to terminate these employees is irrelevant, since the employees were protected by contract and state law, while Plaintiff was an 'at will' employee." Cain, *7.

Plaintiff's "evidence" that the reasons given for her termination are pretext for discrimination are:

1.    No white employee was ever discharged by Dr. Hayden.

This is an irrelevant, immaterial statement that provides no evidence whatsoever of discrimination.  Further, see the discussion above on the irrelevancy of the employees Plaintiff proferred as comparators.

2.    The conduct of white employees -

*Joey George* (contract not renewed after allegations of inappropriate interaction with student),

*Michael Passmore* (terminated and referred to state disciplinary board after allegations of inappropriate interaction with student),

*Karen Golden* (leave without pay and probation by Professional Standards Commission for one year after hitting a student),

*Cathy Coody* (hard-to-find specialty teacher suspended without pay for 10 days after being charged with shoplifting),

*Angie Rust* (allowed to resign) and

*Larry Daniels* (got in a fight but Dr. Hayden unaware of incident) -

was more serious than what Plaintiff was accused of yet they were not terminated.[9] As explained above, these are not valid, legal comparators and even if they were the record shows they were disciplined in a matter consistent with their contracts and the protections granted to them by state law. In her deposition, Plaintiff also mentioned another individual as a comparator, Bill Slade, who allegedly sexually harassed another employee and was not terminated. Along with being a differently classified employee, both individuals involved were Caucasian and there is no legal or factual similarity in that situation to Plaintiff's. Moreover, Slade was allowed to resign and Defendants decided to *not* renew his contract so he did in fact lose his job.

3. Plaintiff was discharged even though she had no prior incident of alleged insubordination.

Dr. Hayden explained Plaintiff's incidents of insubordination as her demeanor and attitude on several occasions and her statements regarding not following her supervisors' directions.

4. Dr. Hayden accused Plaintiff of having a bad attitude but Bill Slade also had an "attitude problem" and was not fired.

This is a vague, immaterial statement that does not show discrimination. Plaintiff provided no evidence of how his situation could in any way be compared to hers, such as if Slade also exhibited unprofessionalism on several occasions in several different ways as

_____

[9]Hayden Dep. at 13-32.

Dr. Hayden believes Plaintiff did.

5.     Plaintiff was accused of insubordination but Dr. Hayden and Rhonda Black admitted she never refused to do anything she was asked.

Dr. Hayden explained Plaintiff's incidents of insubordination as her demeanor and attitude on several occasions and her statements regarding not following her supervisors' directions.

6.     Dr. Hayden claimed to be concerned about preventing gossip but only met with Plaintiff and did not meet with Lisa Woods, Dee Davis or Amos Mimbs who were gossiping about Ms. Coody.

First, Plaintiff is incapable of knowing whether or how many times Dr. Hayden met with any employee about anything.  Second, Dr. Hayden in her discretion decided that talking to the other staff members as a group was sufficient and that Plaintiff, by her own admission, was going to Ms. Coody and relaying gossip.[10]

7.     Dr. Hayden claims that Plaintiff engaged in disrespectful conduct in the Pre-K meeting but failed to list it in the letter of reprimand or any other document.

This again is a vague, irrelevant statement that in no way establishes evidence of discriminatory animus for Plaintiff's termination.

Defendants provided a legitimate, non-discriminatory reason for Plaintiff's termination - Dr. Hayden's belief that Plaintiff was unprofessional and exhibited

---

[10]Plf.'s Dep. at 30.

insubordination and her belief that Plaintiff was unwilling to change in these areas. Because Plaintiff failed to rebut this showing by producing evidence of discriminatory animus for her termination, Defendants' are entitled to summary judgment on the Title VII claims.

### First Amendment Claims

The Eleventh Circuit Court of Appeals explained First Amendment "freedom of association" rights in <u>McCabe v. Sharrett</u>, 12 F.3d 1558 (11th Cir. 1994). In <u>McCabe</u>, a police chief's former secretary sued the city and the police chief claiming they violated her constitutional right to freedom of association by transferring her to less desirable job on account of her marriage to a subordinate police officer. "In order for a public employee to establish that an employer conditioned his or her job in a way that burdened impermissibly a constitutional right, the employee must first demonstrate that the asserted right is protected by the Constitution and that he or she suffered 'adverse employment action for exercising the right." <u>Id.</u> at 1562 (citations omitted).

> According to Supreme Court precedent, the United States Constitution accords special protection to two different forms of association, "intimate association" and "expressive association." <u>Roberts</u> teaches that the right of intimate association - the freedom to choose to enter into and maintain certain intimate human relationships - is protected from undue governmental intrusion as a fundamental aspect of personal liberty. At a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family-marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. Whether the right extends to other relationships depends on the extent to which those attachments share the qualities distinctive to family relationships, such as "relative smallness" and "seclusion from others in critical aspects of the relationship." The right of expressive association - the freedom to associate for the purpose of engaging in activities protected by the First Amendment,

such as speech, assembly, petition for the redress of grievances, and the exercise of religion - is protected by the First Amendment as a necessary corollary of the rights that the amendment protects by its terms. Both the intimate and the expressive association rights are considered fundamental. Therefore, a plaintiff like McCabe can obtain special protection for an asserted associational right if she can demonstrate either that the asserted association closely enough resembles a family relationship to be protected by the right to intimate association, or that the purpose of the association is to engage in activities independently protected by the First Amendment.

Id. at 1562-63 (citing Roberts v. United States Jaycees, 468 U.S. 609, 617-20, 104 S. Ct. 3244, 3249-51 (1984)) (other citations omitted).

[Courts must balance] "the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." The Supreme Court has described such balancing as necessary "to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment."

Id. at 1564-65 (citing Pickering v. Board of Education, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968)) (other citations omitted).

In cases where the employer denies taking the adverse employment action solely because of the public employee's exercise of speech rights, courts perform the causation analysis first articulated in Mt. Healthy City School District Board of Education v. Doyle. First, courts require that the employee, in order to prevail, prove that the speech at issue was a "substantial factor" in the government's decision to demote or discharge the employee. Even if the employee meets the "substantial factor" burden, and even if the challenged action would be otherwise impermissible, the government will nonetheless prevail if it can show that "it would have reached the same decision even in the absence of the protected conduct."

Id. at n.5 (citing Mt. Healthy, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977)). Finally, this balancing test is a question of law and courts may grant summary judgment based on the

outcome of the balance.  Id. at  n.15.

In the case at bar, Plaintiff failed to establish a First Amendment "freedom of association" claim.  First, she failed to show that she suffered an adverse employment action for exercising her alleged "right" to have conversations during school hours with Gwen Brown.  Plaintiff's relationship with Gwen Brown is not one of those protected areas of "intimate" or "expressive" association described above.  Moreover, Plaintiff admitted that Dr. Hayden told her she could speak with Gwen Brown outside of school hours about non-school matters and that Plaintiff was welcome to discuss relevant school matters at any time at the school, even behind closed doors.  However, Plaintiff believes she had a First Amendment right to have whatever type or length of conversation she wanted with whomever she wanted whenever she wanted and in this she and Dr. Hayden disagreed.[11] Further, if Plaintiff was having conversations with Gwen Brown about the weather or any non-school matter, she was not having conversations about matters of *public* concern. Plaintiff also failed to prove that the speech at issue was a "substantial factor" in the decision to discharge her.  The reprimand she received for having personal conversations on school time was one of several examples of what Dr. Hayden believed to be insubordination and unprofessionalism.  Plaintiff also failed to state a "freedom of association" based on her belief that Dr. Hayden "should have honored" Plaintiff's desire to have an attorney present

---

[11]Plf.'s Dep. at 82-83.

in meetings at the school.[12] Dr. Hayden told Plaintiff she was free to meet with an attorney after school hours to discuss whatever she wanted. Even if she met the "substantial factor" burden, and even if the challenged action would be otherwise impermissible, Defendants must prevail on the "freedom of association" claims because they have shown Plaintiff would have been terminated even in the absence of the allegedly protected conduct.

### Breach of Contract Claim

Georgia's Unemployment Security Laws bar payment of unemployment compensation benefits to employees of any "public or nonprofit educational institution" for periods of unemployment occurring between academic years or terms where there is a "reasonable assurance" that such employees will return to their jobs the following term. O.C.G.A. § 34-8-196; Hollis v. Tanner, 341 S.E.2d 290 (Ga. App. 1986). To prevent employees of the Pulaski County School District from applying for unemployment benefits between school years, the school district sends out "reasonable assurance" letters informing classified and non-certified employees there will be funding for their current position the next year.[13] The letter sent in this case specifically stated:

> This letter officially notifies you of reasonable assurance for continued employment for the 2004-2005 school year. Classified and non-certified employees who have reasonable assurance of continued employment are not entitled to draw unemployment during the summer of 2004, even if they are

---

[12]Plf.'s Dep. at 93.

[13]Dixon Dep. at 32.

on a ten or eleven month work year.[14]

Plaintiff Brown contends this "reasonable assurance" letter created an employment contract and that her termination was a breach of that contract. In Georgia, "The nature and character of the services to be performed, the place of employment and the amount of compensation to be paid therefore are all essential elements of an employment contract and must be stated with sufficient definiteness." Sawyer v. Roberts, 432 S.E.2d 610, 611 (Ga. App. 1993) (citing Farr v. Barnes Freight Lines, 97 Ga. App. 36, 37, 101 S.E.2d 906 (1958)). Pursuant to O.C.G.A. § 13-3-1, the essentials of a contract are parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract and a subject matter upon which the contract can operate. The cardinal rule of construction is to ascertain the intention of the parties. O.C.G.A. § 13-2-3.

There is absolutely no evidence whatsoever the Defendants intended the "reasonable assurance" letters sent to all employees of a certain category to be an offer of an employment contract. Being a "classified" employee, Plaintiff Brown was by definition an employee working without a contract, tenure or any type of guaranteed employment. She was a classic "at-will" employee, meaning at the will of her employer Dr. Hayden. Further, Plaintiff failed to establish the elements of an employment contract in that the "reasonable assurance" letter lacked a description of the nature and character of the services to be performed, the place of employment or the amount of compensation to be paid. Even if Plaintiff had established

---

[14]Doc. 60, Plf.'s Ex. 6.

the basic elements of an employment contract, it would be an absurd result for this Court to construe the school district's compliance with the unemployment laws to bind them to a contract with its employees. Accordingly, Plaintiff failed to establish she had a contract of employment and her breach of contract claim is dismissed. Because Plaintiff failed to establish an employment contract, her Due Process claim regarding the same is also dismissed.

### *Immunity*

The individual defendants contend they are entitled to qualified immunity from Plaintiff's claims because they are government actors who were acting with discretionary authority when the decision was made to terminate Plaintiff Brown. Without explaining why, Plaintiff argues the Defendants were not acting within their discretionary authority when she was terminated. The record is clear however that the individual defendants were government actors acting within their discretionary authority when the decision was made to terminate Plaintiff Brown: (1) it was clearly within Dr. Hayden's area of responsibility and authority to recommend Plaintiff's termination to the Board of Education based on her belief that Plaintiff exhibited unprofessionalism and insubordination and (2) it was clearly within the individual Board members' discretionary authority, and that of the Board as an entity, to accept or reject that recommendation. The next determination the Court must make is whether Plaintiff's allegations, if true, established a constitutional violation. Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 153 L. Ed.2d 666 (2002) (citing Saucier v. Katz,

533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001)).  If no constitutional right was violated, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.  Since Plaintiff Brown failed to establish the violation of a clearly establish law or right protected by the United States Constitution, there is no necessity for further inquiries concerning qualified immunity and the Court must grant summary judgment for the individual Defendants on that ground as well.  Further, based on this finding, there is no need to address the school district's liability under the "official policy or custom" principle.  See Monell v. Dept. of Social Services of New York, 436 U.S. 658, 691 (1978).

### *Conclusion*

Because Plaintiff failed to present evidence of a discriminatory motive regarding her termination, failed to establish a "freedom of association" or "freedom of speech" claim and failed to state a breach of contract claim, her claims are dismissed and Defendants' motion for summary judgment is GRANTED.

**SO ORDERED this 22nd day of February, 2007.**

**S/**
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**